Prendergast v. Walsh.

---

THOMAS PRENDERGAST, executor of Cecelia Stanton, deceased,

*v.*

CATHERINE WALSH et al.

[Filed March 23d, 1899.]

1. Testatrix gave to her three sisters, "provided they are all alive, or to the survivors of them, whatever of my money now on deposit" in four banks in New York City (naming them), "which may be on hand and not otherwise disposed of, share and share alike." During her life the testatrix drew her money from the four New York banks and deposited it in another bank, where

it remained until her death.—*Held*, first, that the gift was specific, and second, that it was not adeemed.

2. Testatrix died leaving one sister and the children of one of two deceased sisters surviving her.—*Held*, the surviving sister took in exclusion of the grandchildren.

The bill in this cause is filed by an executor for instructions. Cecelia Stanton, the testatrix, died on the 22d day of August, 1895. Her will was made on the 16th of April, 1890; in it was the following:

"*Item.* I give and bequeath unto my beloved sisters, Catherine Walsh, Julia Kerrigan and Mary Roolan, provided that they are all alive, or to the survivors of them, whatever of my money now on deposit at the Emigrant Bank in Bleecker street, New York, and the Emigrant Bank in Chambers street, New York, and in the Bowery Savings Bank, New York, and in the Wall Street Savings Bank in New York, which may be on hand and not otherwise disposed of, share and share alike."

When she first executed her will she had the following bank deposits: $583.20 in the Seaman's Bank for Savings, on Wall street, New York City; $913.44 in the Emigrant Industrial Bank, on Chambers street, New York City; $199.11 in the Bowery Savings Bank, New York City, and $814 in the Bank for Savings, in Bleecker street, New York—a total of $2,509.75.

On January 14th, 1895, she drew from the Wall Street bank, $583,20; from the Chambers Street bank, $1,055.32; from the Bowery bank, $227.57, and from what was formerly the Bleecker street bank, $883.22—a total of $2,749.31. No deposits had been made between April 16th, 1890, the date of the will, and January 14th, 1895, and the increase in the amount in the last three of the banks mentioned arose from interest allowed upon the deposits.

Margaret Cushing accompanied the testatrix when she went to the four banks and drew these deposits, and to her testatrix said that she was going to deposit the money in the Hoboken bank—she thought it would be safer there. She did not deposit it at once, because she said she would not get any interest on it, and she would wait until the 1st of April. Some time after she took the money to Delia M. Demman in a satchel, and asked her

Prendergast v. Walsh.

to count it. She said she would keep a small amount for her own use, and asked Delia to place the balance in a paper and mark on the outside the amount of money in the paper, and that she would take it to the Hoboken bank, and Delia did as she was directed.

Testatrix afterwards told Delia that she had taken the money and deposited it in the Hoboken bank, and when they asked her how much she had to deposit, she said she did not exactly know, and the bank officer then said, "Here is the amount marked on the package," referring to the figures which Delia had made. Her bank-book shows that she deposited in the Hoboken Bank for Savings on April 1st, 1895, $2,795, which remained there until her death, interest having accrued to the amount of $23.46. She seems to have added to the amount she drew from the New York banks enough to increase that amount from $2,749.31 to $2,795. But that the latter sum included all the money she drew out in New York, I have no doubt, for this money and a mortgage for $300 made up substantially her entire estate.

The testatrix left her surviving one sister, Catherine Walsh, and four children of a deceased sister, Julia Kerrigan. The four children of Julia Kerrigan claim that the money in the hands of the executor is not the same money which was bequeathed to the surviving sister of testatrix, but is general assets of the estate as to which Cecelia Stanton died intestate, and insist that it goes one-half to the surviving sister and one-half to the four children of the deceased sister in equal shares.

*Mr. James A. Gordon,* for the executor.

*Messrs. A. Q. Keasbey & Sons,* for the defendants.

REED, V. C.

The gift of the money was specific. It was a gift of the money in the several banks at the time the will was made, which should not be otherwise subsequently disposed of by the testatrix. It was, therefore, a bequest of a specific thing. *Collins* v. *Collins, L. R. 12 Eq. 455; Conly* v. *Greene, Ir. R. 5 Eq. 430;*

*Larkin* v. *Soloman, 3 Dem.* (*N. Y. Sur.*) *270 ; Towle* v. *Swasey, 106 Mass. 100.*

The important question is, whether the legacy was adeemed by the testatrix, and therefore the thing bequeathed was not in existence at the time of the death of the testatrix.

It is undoubtedly true that a general deposit in a bank creates a debt from the bank to the depositor. The bank is not bound to preserve the money *in specie,* and it can be paid by the delivery of any money of equal amount.

It is also true that a testamentary gift of a debt due to the testator is adeemed if the debt is paid to the testator during his life.

But it seems to me that while such a deposit creates a debt, yet the gift of the amount of such deposit as money or cash differs from the gift of an ordinary debt. It will pass by a gift of all the testator's ready money or cash. Sir Launcelet Shadwell in the case of *Parker* v. *Marchant, 1 Younge & C. 290, 307* (*20 Eng. Ch. Rep.*), affirmed by Lord-Chancellor Lyndhurst on appeal, *1 Phil. 356* (*19 Eng. Ch. Rep.*), said : " Undoubtedly an ordinary balance in the banker's hands is, in a sense, a debt due from him ; certainly he may be sued for the debt. But it may be equally true that in a sense it is ready money. * * * The term debt, however correct, is not colloquially or familiarly applied to the balance at a banking-house. No man talks of his banker being in debt to him. Men speaking of such a subject say that they have so much in their banker's hands, a mode of expression indicating virtual possession, than a right to which the law applies the term *chose in action.*"

To the same purport are the cases of *Mann* v. *Executors of Mann, 1 Johns. Ch. 231,* and *Beck* v. *McGillis, 9 Barb. 35, 59.* In the last case, the court says : " By the bequest of money, of which the testator died possessed, to Mrs. McGillis, she became entitled to the cash, using the popular sense, which at the time of his death the testator had in his possession or deposited in bank, but nothing else."

In the present case the intention of the testatrix was, not to give a mere thing in action. What she gave was the money in the banks, using the words in their popular sense.

Prendergast v. Walsh.

It is true that the money did not exist *in specie* and would not again be delivered to her or her personal representatives *in specie*, yet, having put money there, which was still there as money, liable to be drawn as money, so she designated it as money. The thing she bequeathed she drew from the bank. It remained the identical thing bequeathed until disposed of in some way by her. She could have disposed of it by consuming it in living or turning it into other property, or devoting it to a purpose inconsistent with the bequest. She did neither of these things, but, on the contrary, took the specific thing which she got from the bank and kept it until April 1st following, and then, with a slight addition, placed it in the Hoboken bank. While by this deposit in this last-named bank she lost the right to have the same money again *in specie*, she retained the right to have it as money or cash. If thereafter it was properly designated as money or cash it must be regarded as a part of the same cash which she had taken from the four banks. If the money remained practically the same money, then the removal of it from the place of its deposit did not amount to an ademption. The place of deposit was merely used as descriptive of the thing bequeathed. It was used to identify the particular money given, and it is entirely settled that where the place is merely descriptive the removal of the things to another place is immaterial. *Theob. Wills 130.*

For these reasons I have concluded that this case differs from those which have dealt with gifts of debts due the testator which have been paid to the testator and re-invested. Those gifts were of a chose in action and not gifts of money which remained as such at the time of the death of the testatrix. I conclude, therefore, that the legacy was not adeemed.

There is another suggestion made in behalf of the children of Julia Kerrigan, the deceased sister. It is that Julia Kerrigan, although dying before the testatrix, yet our statute to prevent lapses operates to transfer her share to her children. But it is manifest that the date at which the survivorship was to exist was the period of distribution, which, in this instance, was the date of the death of the testatrix. The death of Julia Kerrigan

before that event defeated her legacy. The will of the testatrix gave a share only to a sister who survived her. In the face of this testamentary intention, the statute concerning lapses, by its own provision, became inoperative.

The question whether the interest which has accrued upon the funds which were in the banks at the time of the execution of the will is a part of the specific bequest has become of no importance, for the payment of the expenses of administration has left less than the amount on deposit at the time of the execution of the will in the hands of the executor.

I conclude, therefore, that $2,420.75 of the amount in the Hoboken bank was the specific thing bequeathed to the three sisters, and such part of it as remains now belongs to Catherine Walsh.