HALL ET AL. *v.* ELLIOTT ET AL.

[No. 417, September Term, 1963.]

*Decided August 4, 1964.*

*Motions for rehearing or to remand case or, in the alternative, for modification of opinion, filed August 24, 1964, and September 3, 1964, denied September 15, 1964.*

The cause was argued before the entire Court.

*B. Conway Taylor, Jr.,* with whom were *William M. Nickerson* and *Due, Whiteford, Taylor & Preston* on the brief, for Bessie L. Hall, one of the appellants.

*Clayton W. Daneker,* with whom were *Constable, Alexander & Daneker* on the brief, for the other appellants.

*Robert C. Prem* for the executors under the will, two of the appellees.

*Ward B. Coe, Jr.,* with whom were *John F. King* and *Anderson, Coe & King* on the brief, for Munsey T. Mowbray, an appellee.

*Paul E. Burke, Jr.,* with whom were *William B. Somerville* and *Smith, Somerville & Case* on the brief, for Charles A. Mowbray, and others, also appellees.

*G. Van Velsor Wolf* and *William B. Stansbury, Jr.,* with whom were *Mathias J. DeVito, Mary Katherine Scheeler, Charles W. Held, Jr., F. Duncan Cornell* and *Piper & Marbury* on the brief, for the Salvation Army, and others, also appellees.

HORNEY, J., delivered the majority opinion of the Court. BRUNE, C. J., and HENDERSON and SYBERT, JJ., dissent. Dissenting opinion by HENDERSON, J., at page 216, *infra.*

The principal question raised on this appeal is whether the specific legatees named in the will are entitled to indemnification out of the rest and residue of an estate for the shares of corporate stock they lost as a result of the widow electing to take against the will.

Reginald G. Mowbray (the testator) died on January 17, 1962, survived by his second wife, Munsey T. Mowbray. He had no children or descendants and his father and mother had predeceased him. His closest living relative was a brother, to whom (or to the brother's wife should he predecease the testator) he bequeathed a pecuniary legacy by the residuary clause of his will. At the time of his death, the testator owned real estate valued at $43,000 and personal property worth approximately $450,000, a large portion of which consisted of the capital stock of the James Walker Company, a marine supply corporation the testator founded in 1911, of which he was president when he died, and in which he held one hundred and six of the two hundred and ten outstanding shares of stock, estimated as worth $1,400 to $2,000 per share.

Before their marriage, the second wife and the testator entered into an antenuptial agreement, by the terms of which they mutually waived and released all claims or rights of dower and other marital rights in the estate and property of each other. Several years after their marriage, the testator executed a will in which he bequeathed ten of his one hundred and six shares of the Walker stock to his wife and bequeathed the remaining ninety-six shares (subject to the conditions specified in the will) in trust for the benefit of nine named longtime employees

of the James Walker Company and stated in the will that his purpose in so doing was "to recognize the loyalty and devotion" of such employees as his business associates over a period of many years. Some of the employees were already stockholders in their own right and the bequest of ninety-six shares assured them control of the company as a group. There were no other specific bequests. But in a three-tiered residuary clause, the testator devised and bequeathed the rest and residue of his estate to named relatives of himself and his first wife and to certain specified charities. Under the provisions of the first tier he bequeathed pecuniary legacies totaling $60,000 to the relatives with provisos that upon the happening of certain events, the bequests were to become a part of the residuary estate. By the second tier, if there was any excess after paying the specific and first tier residuary legacies, the testator bequeathed $5,000 to each of four designated charities and $10,000 to a fifth. And, by the third tier, the residue of the estate, if any should remain, was bequeathed in equal shares to two other charities. It was further provided that both the first and second tier residuary legacies should abate proportionately in the event the estate was insufficient to pay them in full. In such case there would be nothing for the third tier legatees to take. Throughout his life, the testator had contributed to and was actively interested in and closely associated with the charitable institutions of a religious nature mentioned in the second and third tiers of the residuary clause. The will further provided that all federal and state estate and inheritance taxes (including documentary stamp and stock transfer taxes) as well as all debts, funeral expenses and administration costs should be paid out of the estate.

With regard to the shares of stock bequeathed in trust for the employee legatees, the trustee was directed to divide and distribute the stock to the named employees in the proportions specified in the will, provided (1) that such employees should be alive and in the employ of the company at the time of the death of the testator and (2) that such employees within three months thereafter should execute an irrevocable agreement between themselves designed to carry out the testamentary plan. The trust agreement was duly executed. Under it, each employee legatee covenanted with the others and on behalf of their re-

spective estates to offer the stock so held in trust for them, either upon death or during life, before selling it to an outsider, to the remaining trust beneficiaries then holding the stock bequeathed to them, at forty per centum of book value as shown on the financial statement of the company as of the end of a fiscal year.

The record, in addition to showing that the surviving widow had been apprised, before the antenuptial agreement was executed, of the desire and plan of the testator to bequeath the controlling interest in the James Walker Company to the employees, discloses that the testator knew that his second wife — though he was sure she would not—could set aside the antenuptial agreement if she chose to and renounce the will. The testator, however, probably because he believed that his wife would abide by the agreement and knew that even if she did not, he had sufficient estate to fully satisfy her claim and gratify his preference for the employees, made no provisions as to who should bear the loss in case the widow chose to annul the agreement and elect against the will.

After the death of the testator, the antenuptial agreement was annuled by a decree of the Circuit Court for Baltimore County because the testator had not fully disclosed his financial worth to his future wife and she had not been advised of her rights or represented by counsel. There was no appeal. Subsequently, the widow renounced the legacy to her of ten shares of stock and elected to take her statutory share of both the real and personal estates.

In this action brought by the executors of the will against all of the legatees and devisees for the construction of the will and for directions as to the administration and distribution of the estate and the cash dividends that had accumulated from the stock since the death of the testator, the decree provided, among other things, that, after the payment of estate taxes and inheritance taxes (except state inheritance taxes chargeable to the widow), debts, funeral expenses and administration costs, the widow should take $4,000 in cash and a one-half interest in all other assets, such as cash, and specific property, such as shares of stock, including fifty-three shares of the Walker stock; that the trustee for the benefit of the employee legatees should re-

ceive the remaining fifty-three shares subject to the restrictive terms and provisions of the will and trust agreement; that the accumulated dividends from the Walker stock should be paid in equal parts to the widow and trustee; that the first tier residuary legacies to the relatives should be paid in full without interest; and that payment of the remaining residuary legacies would be contingent on the adequacy of the residue to pay the widow's share of the estate and the first tier residuary legacies.

The findings of the lower court that all taxes (except state inheritance taxes due by the widow) should be paid out of the estate is not contested. Nor is it disputed that the accumulated dividends from the Walker stock should follow the distribution of the shares of stock. All of the employee legatees (except the one who was named as coexecutor) contend that the widow's share of the estate should be satisfied out of the rest and residue without disturbing the specific bequest of ninety-six shares of Walker stock bequeathed to them. All of the employee legatees who appealed (except one who does not claim reimbursement by way of sequestration) further claim that they are entitled to distribution of the ninety-six shares of stock in kind, or in the alternative, that the portion of their legacy which is allowed to stand should be supplemented by (a) sequestration of the ten shares of stock renounced by the widow and (b) indemnification out of the rest and residue of the estate for such shares as they will lose as a result of the widow having renounced the will. And all of the appellants (except one) further contend that if less than ninety-six shares of stock are distributed to them, then such shares should be distributed free of trust and the restrictions contained in the terms and provisions of the will and the trust agreement executed in compliance therewith. On the other hand, the widow (as well as some of the other appellees) contend that she is entitled to take her share of the estate (including the Walker stock) in kind. The first tier residuary legatees, contending that the gifts to them were in the nature of general pecuniary legacies and not residuary bequests, assert that the disappointed specific legatees are not entitled to indemnification from the residuum. Some of the other appellees concede that the appellants (by application of the doctrine of sequestration) should be awarded the ten shares of

stock renounced by the widow, but insist that the renunciation divested the employee legatees of one-half of the ninety-six shares by operation of law and that the divestiture was in the nature of an ademption. Finally, the executors of the estate contend that the shares of stock awarded to the employee legatees should be distributed to the trustee subject to the trust agreement and the restrictions with regard to their transferability.

The renunciation of a will by a surviving spouse and an election to take under Code (1963 Supp.), Art. 93, § 329 (b), more often than not, defeats the intention of the testator (or testatrix) to some extent, and, in such event, since it is necessary for other legatees (or devisees) to contribute all or part of their bequests to make up the statutory share to which the elector is entitled, the courts are required to determine which of the other beneficiaries are legally bound to make contribution. That, as previously stated, is the principal question presented by this appeal, and the solution of it depends primarily on the legal status of the other named beneficiaries as specific, general or residuary legatees, and on such indication as the testator may have given, if any, that certain legatees were preferred by him over others.

In Miller, *Construction of Wills,* § 126 (see also § 128), a specific legacy is defined "as a bequest of a particular thing, or money, specified and distinguished from all others of the same kind," such as the bequest in this case of ninety-six shares of Walker stock to the employee legatees. And in Miller (see §§ 125, 128), a general legacy is defined as "one which is payable out of the general assets of the estate of the testator, being a gift of money or other thing in quantity, and not in any way separated or distinguished from other things of like kind." Ordinarily, the bequest of a sum of money (*i.e.,* a pecuniary legacy) is a general legacy. *Matthews v. Targarona,* 104 Md. 442, 65 Atl. 60 (1906) ; *Gelbach v. Shively,* 67 Md. 498, 10 Atl. 247 (1887). And the bequest of the rest and residue of an estate is a general legacy. *Bristol v. Stump,* 136 Md. 236, 110 Atl. 470 (1920). A specific legacy almost always has priority over other bequests. The assets available for other legacies must be exhausted to pay debts and costs before assets specifically bequeathed may be used for such purposes. And, if the assets of

the estate are sufficient to pay all debts and costs, but not sufficient to pay all of the legacies, the specific legacies have priority over other legacies, the deficiency of assets falling upon such other legacies. Miller, *op. cit.*, § 127. On the other hand, a specific legacy is subject to certain legal disqualifications and disadvantages, for if a specific legacy fails, the specific legatee is not entitled to be compensated out of the personal estate of the testator. In such case, the legacy is said to have been adeemed. Miller, *op. cit.*, § 127, *supra.* See also *England v. Vestry of Prince George's Parish,* 53 Md. 466 (1880) ; *Devecmon v. Kuykendall,* 89 Md. 25, 42 Atl. 963 (1899) ; *Bristol v. Stump, supra.*

The right of a renouncing spouse to take his or her share of the estate in kind has been the law in Maryland for many years. See *Evans v. Iglehart,* 6 G. & J. 171, 192-193 (1834), and *Kuykendall v. Devecmon,* 78 Md. 537, 543, 28 Atl. 412 (1894), construing Chapter 101 of the Laws of 1798.[1] The combination of the concepts that a specific legacy was subject to certain disabilities and liabilities and that a renouncing spouse was entitled to take his or her share of the estate in kind led to the earlier rule laid down by this Court in *Darrington v. Rogers,* 1 Gill 403 (1843)—and thereafter followed in *Devecmon v. Kuykendall, supra; Cockey v. Cockey,* 141 Md. 373, 118 Atl. 850 (1922) ; and *Safe Deposit & Trust Co. v. Gunther,* 142 Md. 644, 121 Atl. 479 (1923)—to the effect that the loss suffered by specific legatees (held not to be compensable from residuary legacies) by a spouse electing to take a statutory share was one resulting by operation of law and against which only the testator could provide indemnity.

But this is not an inflexible rule because sequestration, which is a corollary or facet of the equitable doctrine of election, has been applied by this Court whenever it was found proper to do so. Sequestration means that so much of a devise or legacy as does not pass to a renouncing spouse by virtue of the renunciation is made available by the courts to indemnify or com-

---

1. Under Code (1963 Supp.), Art. 93, § 329 (b), the decedent, if he or she is not survived by descendants or a father or mother, the spouse is entitled to "four thousand dollars * * * and one half of the residue of the lands as an heir and one half of the surplus personal estate remaining * * *, and no more."

pensate other beneficiaries whose legacies have been diminished as a result of the renunciation. Thus, in a case such as this where the widow was bequeathed ten shares of the Walker stock, she takes five shares by operation of law and the remaining five shares is available to compensate in part the legatees whose shares have been reduced by her renunciation. Generally, as pointed out in 1 Sykes, *Probate Law and Practice*, § 180, "the order of distribution among the disappointed legatees is the reverse of the normal order in which legacies are abated [Dowell v. Dowell, 177 Md. 370]. Thus, if beneficiaries of both specific and residuary gifts suffer, the specific devisees and legatees are entitled to compensation first [Read v. Maryland General Hospital, 157 Md. 565] ; and if a specific legatee cannot be compensated out of property which has been renounced, he is entitled to compensation out of the residuary estate [Mercantile Trust Co. v. Schloss, 165 Md. 18] * * *."

Moreover, it has been held that when a widow is given an estate for life with remainder to others and she renounces, the court, depending on the intention of the testator, may immediately accelerate the remainders as if the widow had died, or, will delay acceleration and order the remainder of the fund or estate held in trust and the income to be used to alleviate the loss suffered by the other legatees and devisees. *Hinkley v. House of Refuge,* 40 Md. 461 (1874). See also Miller, *op. cit.,* §§ 297, 298, and the cases cited therein. Obviously, the doctrine of sequestration is based on doing as little harm to the intention of the testator as is possible under the circumstances. If the renunciation causes a substantial distortion of the testator's plan of distribution, and his intention is sufficiently clear that the beneficiaries whose legacies have been diminished should receive what the testator desired to give them, the courts apply this doctrine in an effort to carry out such intention. All the text writers seem to agree on this. See Restatement, *Property,* §§ 228, *et seq.;* 2 Pomeroy, *Equity Jurisprudence* (5th ed.), §§ 517, *et seq.*

Sykes, *op. cit.,* § 180, *supra,* states that three basic approaches have been employed to compensate for the loss to beneficiaries caused by the renunciation of a spouse. In a minority of the states each legacy suffers its proportionate share of the total loss.

In a majority of the states renunciation is analogous to any other shrinkage of the estate and the ordinary rules of abatement are applied. The author then goes on to say:

"A third view is that the solution of the problem should be left to the discretion of the chancellor to consider in each case the relationship of each legatee to the testator and any other relevant facts in order to arrive at the probable intention of the testator. The chancellor in effect rewrites the will as he thinks the testator would have rewritten it, if he had had the possibility of renunciation in mind [61 Har. Law Rev. 850]. The Maryland rule seems to combine the last two approaches. Generally, the ordinary rules of abatement of legacies control [Webster v. Scott, 182 Md. 118; Marriott v. Marriott, 175 Md. 567], but the chancellor is not bound by them if the facts in the case indicate that they would not effectuate the testator's intention. The chancellor will then endeavor to ascertain the primary intention as expressed in the will and carry it into effect as far as possible, with a minimum disturbance of the general plan [Mercantile Trust Co. v. Schloss, 165 Md. 18]."

Similarly, with respect to relieving some of the distortion between types of legacies and devises, Professor Reno in his article, *The Maryland Order of Abatement of Legacies and Devises*, 17 Md. L. Rev. 285, had this to say, at pp. 307, 308:

"The Maryland rule of treating [the depletion of the testator's estate by the spouse's renunciation] as a loss by operation of law is simple of operation, but its application may result in a 'substantial distortion' of the testator's scheme of distribution. If equity will exercise its power of sequestration over the renounced interest, this distortion can be greatly reduced. Great flexibility exists in the equity court under this doctrine, but this is probably more desirable than the arbitrary application of the Maryland order of abatement to these cases. It should be noticed that the application of the

doctrine of sequestration, whereby the specific legatees and devisees are reimbursed for their losses, tends to reach the same result that would be reached if the Maryland order of abatement had been applied. However, the very fact that flexibility exists permits the equity court to exercise its discretion in applying sequestration both as to amount and procedure. Thus, the testator's plan of distribution can be carried out on a modified scale with little distortion between the types of legacies and devises."

In Restatement, *Property*, § 228, *supra*, it is said at p. 937: "When an attempted succeeding interest is ineffective, the operation of that part of the limitation which purports to create prior interest is determined by the judicially construed intent of the conveyor." Comment *a* to this section says that the rule as to the ascertainment of the intent of a conveyor (including a testator) recognizes that "a conveyor seldom envisages the failure of a part of his limitation," and adds:

"Hence the judicially construed intent of the conveyor consists often of judicially crystallized conclusions as to what a conveyor, under the circumstances of the particular conveyance normally would have intended, if he had actually considered the possibility of the partial ineffectiveness of his expressed complete plan."

Since sequestration is but one of the means of carrying out the intention of the testator where there has been a renunciation, and the assets available for sequestration are often nonexistent or inadequate to compensate a disappointed legatee, a majority of the courts have held that a beneficiary who has lost part of a specific legacy is entitled to be compensated out of assets which would otherwise go to some less preferred legatee than the specific legatee. In 5 *Page on Wills* (Bowe-Parker Revision), § 47.46, it is said:

"Some states, probably a majority, hold that if a beneficiary who has lost a specific gift cannot be adequately compensated out of the property which has been renounced, he is then entitled to be compensated out of

> the residuary estate. Accordingly, in such jurisdictions, if beneficiaries of both specific and residuary gifts suffer, the specific devisees and legatees are entitled to be compensated first. This rule does not prevail where it appears that the testator did not intend the beneficiaries of specific gifts to have preference over residuary legatees."

To the same effect, see § 12 of the annotation in 36 A.L.R. 2d 291, at p. 322.

Some years ago (in 1929 to be exact), this Court began modifying the earlier rule (applied in *Darrington* in 1843 and consistently followed through *Gunther* in 1923) by holding that a preferred legatee should be paid in full at the expense of less preferred legatees where it appeared the testator intended to prefer certain legatees over others.

In *Read v. Maryland General Hospital,* 157 Md. 565, 146 Atl. 742 (1929), where the husband of the testatrix, who had been given one-third of her estate for life, renounced the will and thereby became entitled to one-half of the estate, it was held that the fact that another one-third share given in trust after payment therefrom of several individual pecuniary legacies was reduced to one-fourth by the renunciation of the spouse, did not require the proportionate abatement of the individual legacies since the testator had not so intended.

In *Johnson v. Stringer,* 158 Md. 315, 324, 148 Atl. 447 (1930), the Court, after stating that "a renunciation by the widow makes only such changes in the will and in the intention of the testator as the law compels," quoted and adopted the language of a Pennsylvania case (Disston's Estate, 101 Atl. 804) that "in a case like the one before us, the effort must be to find and carry out the testator's chief intent with a minimum disturbance of the general plan of the will."

In *Mercantile Trust Co. v. Schloss,* 165 Md. 18, 166 Atl. 599 (1933), the testator, after giving a pecuniary legacy and certain leasehold property to a friend, bequeathed the rest and residue of his estate in trust for his widow for life. The widow renounced and thus became a tenant in common with the friend of the leasehold property. The Court, citing the prior cases as to

intent, found a compelling intention on the part of the testator to give the friend the pecuniary legacy and leasehold property before anything was bequeathed to the wife and ordered that the loss of half of the leasehold property as well as all of the pecuniary legacy should be paid to the friend from the corpus of the remainder of the trust before it was accelerated so as to vest in the remaindermen. The suggestion that *Schloss* should be read as a case of sequestration is not sustainable, for that was not the holding in the case. The wife was given only a life estate and no order was passed to hold the remainder of the trust and use the income to indemnify the friend. Nor did the Court determine the present value of the amount of income from the renounced life estate which would have been necessary to provide indemnity and deduct that amount from the corpus of the estate.[2] In deciding the case, the Court recognized the rule of *Darrington, Devecmon, Cockey* and *Gunther,* to the effect that loss to the beneficiary was a loss by operation of law against which only the testator could provide, but held that it did not apply to the facts of *Schloss*. In so doing, it pointed out that the friend was the first object of the testator's bounty, "even to the exclusion of the widow," and went on to say (at p. 30) :

> "The renunciation of the widow does not change the intent as expressed in the will, and should not be allowed to defeat such declared intention, unless it be impossible to give it fulfillment. It was the declared intent of the testator that [the friend] should receive her legacy before those entitled to the remainder of the trust fund; and, while the renunciation of the widow takes from her one-half of the [leasehold] property, she should be reimbursed from the remaining corpus of the trust before the remaindermen entitled to that corpus receive any part thereof."

Clearly *Schloss* was a case of indemnification of a specific legatee at the expense of the residuary legatees. The text writers

2. This last suggestion was made by Professor Reno in 17 Md. L. Rev. 285, but there was no argument in the briefs to support the suggestion and there was no holding in the case to that effect, and other authorities do not agree.

agree as to this. See Sykes, *op. cit.,* § 180, *supra,* pp. 181-183, note 76; and *Page on Wills, supra,* § 47.46, p. 693, where *Schloss* is cited for the proposition that a beneficiary, who has lost a specific gift and cannot be adequately compensated out of the property which has been renounced, is entitled to be indemnified out of the residuary estate. See also § 14[a] in 36 A.L.R. 2d 291, at p. 325, where in citing *Schloss* as having distinguished contrary Maryland decisions, it was said that the courts agree that the proper conclusion to the question of whether a specific legatee can require residuary legatees to compensate him "is that which most nearly coincides with what the testator intended"; and the same section at p. 326, where the annotators, in saying that some courts have "held compensation to disappointed specific devisees and legatees from residuary beneficiaries to be proper," cite *Schloss* with a notation to compare *Darrington, Devecmon, Cockey* and *Gunther.*

In *Marriott v. Marriott,* 175 Md. 567, 3 A. 2d 493 (1939), where a widow renounced the will and elected to take her statutory share of the estate, it was held that the beneficiaries of specific legacies, to whom the will also bequeathed pecuniary legacies, were entitled to be paid in full out of the estate, after satisfaction of the widow's claim, at the expense of the general or residuary legatees because the testator so intended. There, in citing cases from Connecticut (Shannon v. Eno, 179 Atl. 479) and Illinois (Pace v. Pace, 110 N. E. 878) and in approving the Pennsylvania rule (laid down in Gallagher's Estate, 76 Pa. 296, and Lonergan's Estate, 154 Atl. 387), it was said (at p. 577 of 175 Md.) that "if both specific and residuary legatees and devisees suffer because of the widow's election against the will, the former must be made whole before the latter receive anything." We think it is clear that *Marriott* stands for the proposition that specific legatees as well as general legatees are entitled to be compensated out of the residuum where (a) there is a residue; and (b) the manifest intention of the testator is to have such legatees paid in full. Moreover, in deciding *Marriott,* it is apparent that the Court read and applied *Schloss* as authority for the proposition that this was then the law of Maryland.[3] In so doing, it is manifest that in *Schloss*

---

3. The record in the *Marriott* case leaves no doubt that specific

and *Marriott,* this Court swung over to the majority rule wherever and whenever the intent of the testator justified it, and did it deliberately as a choice between two lines of authority.

There is nothing in *Dowell v. Dowell,* 177 Md. 370, 9 A. 2d 593 (1939), or *Webster v. Scott,* 182 Md. 118, 32 A. 2d 475 (1943), indicating a return to the earlier rule. In *Dowell,* it was pointed out that, unlike *Schloss,* there was no manifestation of an intent that the specific legacies were to be paid in full in preference to the residuary gifts. And in *Webster,* there was neither a residue nor an intention on the part of the testatrix that those receiving pecuniary legacies should compensate losses to specific legatees.

The suggestion by some of the appellees that there is an analogy between cases in which renunciation makes it impossible for a specific legacy to be given effect and cases in which a specific legacy is adeemed if the testator parts with the thing bequeathed after the will is executed, is not persuasive. In the first place, although in *Elwyn v. DeGarmendia,* 148 Md. 109, 128 Atl. 913 (1925), it was said that the existence of ademption is to be sought for in the facts as to the destruction or loss of the thing specified in the legacy, or loss of its identity as specified, rather than in a change of intention on the part of the testator, this Court has indicated that intention is a very

---

legatees and general legatees were treated as having identical rights in this respect. Therein it was stipulated that the named legatees were specific legatees who were claiming that there should be no diminution in the legacies bequeathed to them as a result of the widow taking her statutory share of the estate. On the contrary, the residuary legatees contended that the loss occasioned by the election of the widow should fall not only on them but on all other designated legatees (including the general pecuniary legatees) proportionately. The Orphans' Court ruled against the specific legatees, and on appeal the brief of the trustee pointed out that "as to sharing the loss between (a) specific or general beneficiaries and (b) beneficiaries of the residue, there is a conflict of authorities, some holding—(a) specific or general beneficiaries should be made whole before any part of the estate falls into the residue; and others—(b) that the loss is caused by operation of law and must fall equally on all." And the brief of the specific beneficiaries cited the majority rule throughout the United States, particularly the Pennsylvania rule, which this Court adopted in *Marriott,* relying heavily on *Schloss.*

decisive factor as to whether or not there has been an ademption in a particular case. For example, on the one hand, in *Gardner v. McNeal,* 117 Md. 27, 82 Atl. 988 (1911), where stock was adeemed by its sale and the proceeds reinvested, it was held that the legatee had no claim either to the reinvested proceeds or the value of the stock sold, but, on the other hand, in *Johns Hopkins University v. Uhrig,* 145 Md. 114, 125 Atl. 606 (1924), where, by reason of corporate reorganization there was a substitution of stocks specifically bequeathed to bonds, it was held that there was no ademption because the testator did not initiate or control the exchange. Miller, *op. cit.,* § 141, states that a principle in connection with the general rule is that ordinarily proceeds of stock specifically bequeathed which is adeemed cannot be followed, but that where, as in *Uhrig,* the testator did not cause the exchange of one form of investment for another, this result does not ensue; and then adds that the law "seems to be applied in such manner as will accomplish the intention of the testator that the gift should pass to the named beneficiary, and not to a residuary devisee or legatee, and in order to avoid an intestacy which might occur if the gift were adeemed." See also *Seifert v. Kepner,* 227 Md. 517, 177 A. 2d 859 (1962), wherein it was pointed out that even *DeGarmendia* had recognized the importance of the intention of the testator as had *Uhrig* and other earlier cases. The overriding consideration, in any event, is the intention of the testator, and on several occasions, it has been held that a specific legatee, who had been disappointed by a renunciation will be made whole, as nearly as may be, either by way of sequestration, as in *Dowell,* or by payments from the residue, as in *Schloss* and *Marriott.* Thus, if the intention of the testator is that either or both should be done, any similarity between an ordinary ademption case and an analogous situation in an ordinary renunciation case would be inconsequential and the intention would prevail.

While it may be true that the terms and provisions of the will and trust agreement under which the ninety-six shares of stock were to be distributed to the employee legatees had the effect of perpetuating the existence of the James Walker Company, it is nonetheless evident that the testator's primary intention in doing such was to benefit those employees who, as his

business associates for many years, had demonstrated their loyalty and devotion to him and the company he had founded. By requiring an employee legatee, who wished to sell during his life, and his estate to do likewise after his death, to first offer his stock to the other employee legatees at forty per centum of its book value, the testator was assuring that control of the company would remain in the specified employees so that they would receive the maximum benefits therefrom. Apparently, the testator believed that this factor coupled with the benefits which the employees would receive from their salaries, the dividends from the stock and the eventual sale thereof to the remaining preferred employees would exceed the benefits they would receive if the stock was given to them outright without any restrictions as to its sale. In any event, it is clear that these employees were first in his mind and that he preferred them over all legatees, including his wife and relatives and the charities in which he had been interested throughout his life, since all of his estate (except the specific bequests of his Walker stock to his wife and the employees) was to pass under the residuary clause wherein he provided that if the residuum should be insufficient to pay all debts, estate and inheritance taxes, and administration expenses, the first and second tier legacies were to abate proportionately without diminution of the specific legacies. Only if there was an excess in the residuum after the payment of debts, taxes and expenses, and the specific legacies as well as the first and second tier residuary legacies, were the legatees in the third tier to be benefited.

Thus it is apparent to us that the testator intended to prefer the employees over all other legatees. Such, insofar as intent is concerned, was the situation in *Schloss,* and, for that reason, we think this case is governed by the *Schloss* and *Marriott* cases. In these circumstances it makes no difference whether the first, second or third tier legatees are regarded as residuary legatees or general pecuniary beneficiaries because the intention of the testator that their bequests were to be subordinate to the specific legacies given to the employees makes any technical difference between dissimilar kinds or types of legacies immaterial. In any event, where both specific and residuary legacies suffer, the specific legatees are entitled to be compensated first.

*Read v. Maryland General Hospital, supra,* at p. 570 of 157 Md. And, if specific legatees cannot be compensated out of property which has been renounced, they are entitled to compensation out of the residuary estate. *Mercantile Trust Co. v. Schloss, supra,* at p. 29 of 165 Md. The situation here is contrary to that in *Webster v. Scott, supra.* In *Webster,* there was no intention that the pecuniary legatees were to make the legacies of the specific legatees whole. Here, there is such an intent and it must be given effect.

We conclude, therefore, that if a specific legatee whose legacy has been diminished by renunciation can be made whole by means of sequestration where, as here, it is shown that such was the intention of the testator (as has always been the law of this state), there is no reason why such a specific legatee cannot be made whole from the rest and residue, or from money and other property given to general legatees, where, as here, the testator so intended, and we so hold. It follows, since the renouncing widow is entitled to receive fifty-three shares of the Walker stock (forty-eight of the ninety-six shares bequeathed to the employees and five of the ten shares which the widow gave up by renouncing the will), that the employee legatees, in addition to receiving five of the renounced shares, are entitled to be indemnified out of the rest and residue of the estate to the extent of the value of the forty-three shares they were deprived of as a result of the widow having taken against the will. In this way, there is a possibility, since the widow indicated at the argument that she was willing to take the monetary value of her shares of the Walker stock and allow the employee legatees to have it, that the foremost part of the testamentary plan of the testator can be carried out to the letter.

The further contention of some of the employee legatees that if less than ninety-six shares of the Walker stock are distributed to them, then such shares should be distributed free of the trust and without the restrictions imposed by the will and trust agreement is without substance. While it is true, as it is said in the Restatement, *Trusts* (2d), § 335, that "if the purposes for which a trust is created become impossible of accomplishment or illegal, the trust will be terminated," we see nothing illegal in the trust contemplated by the testator. Even if the widow should

216

change her mind and refuse to allow the employees to take her shares at their monetary value, or buy them at some other valuation offered by the employees, the purposes of the trust would not be wholly defeated by the fact that the res had been reduced. Cf. *Liberty Trust Co. v. Weber,* 200 Md. 491, 90 A. 2d 194 (1952), *mod.* 200 Md. 523, 91 A. 2d 393 (1952). And see *Kirkland v. Mercantile-Safe Deposit Co.,* 218 Md. 17, 22, 145 A. 2d 230 (1958); 3 Pomeroy, *op. cit.,* § 991c; Bogert, *Trusts* (2d ed.), § 1008.

On appeal, the awarding of costs is in the discretion of this Court, and are usually awarded against the losing party. Maryland Rule 882 a. But in this action in equity brought by the executors for a construction of the will and for directions as to the administration and distribution of the estate to determine important questions of real difficulty and the appeal was necessary to finally decide to whom one-half of the net estate was distributable, we think the costs should be paid out of the estate. The situation here is distinguishable from that in *Urquhart v. Alexander,* 218 Md. 405, 147 A. 2d 213 (1958).

> *Decree affirmed in part and reversed in part and case remanded for modification of the decree in conformity with this opinion; the costs on appeal to be paid out of the estate.*

HENDERSON, J., filed the following dissenting opinion, in which SYBERT, J., concurred and BRUNE, C. J., concurred in part.

I disagree with the conclusion reached by a majority of the Court in this case and state my reasons as concisely as I can. I shall not attempt to restate the facts. As I read the decision, it repudiates what is called "the earlier rule" laid down in the Maryland cases, and overrules them. This seems to me to be peculiarly unfortunate, because this Court has sedulously observed the rule of *stare decisis,* and stressed the need of certainty, in the field of testamentary law. If lawyers cannot rely

upon past adjudication, in advising their clients, they should be licensed as soothsayers.

Professor Reno, in the article cited (17 Md. L. Rev. 285, 298), points out that at least under the earlier cases there was no question but that the loss suffered by a specific legatee caused by a renunciation was not compensable. The renunciation, removing from the estate the specific property bequeathed, operated in the same manner as an ademption, a term used to describe the removal from the estate of the specific thing bequeathed, prior to the testator's death, rendering it impossible to carry out the testator's declared intention. The disappointed legatee was not entitled to reimbursement for the simple reason that the loss came about by operation of law. It is true that ademption does not result where there is a mere change in the form of the property bequeathed. The cases of *Johns Hopkins University v. Uhrig, supra* (substitution of bonds for stocks by reason of a corporate reorganization), and *Seifert v. Kepner, supra* (liquidating dividend substituted for stock in a case where the bequest was of "the proceeds" of certain stock) do not turn on any question of indemnification. They rest on the proposition that the specific property is still *in esse,* or at least capable of being traced directly into the substituted *res.* In the instant case the ten shares the widow was compelled to surrender to the estate by her election were still *in esse,* and the five shares remaining, after the allocation of one-half to her, were available to satisfy, *pro tanto,* the specific bequest. Hence there was no ademption of these shares.

The majority opinion seems to brush aside the whole theory of ademption, and to substitute speculation as to an unexpressed intention for a definite rule of law. I find nothing in the cases to justify this. In *Darrington v. Rogers,* 1 Gill 403, 410 (1843), Judge Dorsey, for the Court, said: "The election of the widow, to stand upon her legal rights, does, it is true, occasion loss to the appellants; but it is a loss resulting by operation of law, and against which the testator only could have provided an indemnity." That is still the law. In *Levin v. Safe Dep. & Tr. Co.,* 167 Md. 41, 45, Chief Judge Bond, for the Court, said: "Adherence to the plan under the altered conditions requires, we think, that the remainders in the widow's half should be held

inoperative now; the renunciation having the same effect as ademption of a specific legacy." In *Webster v. Scott,* 182 Md. 118, 121, Judge Ogle Marbury, for the Court, in regard to the effect of renunciation upon certain stock specifically bequeathed, said: "The result is a situation similar to that of an ademption * * *." The *Webster* case appears to be the latest case upon the subject.

The majority opinion deals at length with the doctrine of sequestration. This is a recognized equitable doctrine, applied in numerous cases beginning with *Hinkley v. House of Refuge,* 40 Md. 461 (1874). The doctrine is applicable only to cases where, by reason of a renunciation, the property left to the renouncing spouse is surrendered to the estate, and available to compensate disappointed legatees out of the windfall. But this is a far cry from the situation in the case at bar, where there is no windfall and no property surrendered except the five shares the employees receive under the decree. The majority opinion makes whole the specific legatees at the expense of the others, on the basis of an assumed intention which the testator deliberately refrained from expressing. The prior Maryland cases, as I read them, do not require or justify the adoption of such a rule.

The majority opinion relies heavily upon *Mercantile Trust Co. v. Schloss,* 165 Md. 18, and states that the case was not one of sequestration. I cannot agree. The prayer of the bill was that "the benefit intended for the widow should be sequestered to compensate * * *" the specific legatee for the loss of an undivided interest in leasehold property valued at $7,000. Judge Digges for the Court said (p. 27) : "The second question presented * * * is whether or not the doctrine of sequestration should be applied in order to compensate Mrs. * * * White for the loss of one-half interest in 402 West Saratoga Street. The renunciation of the widow, * * *, so far as regards the remaindermen's interest in the estate, was equivalent to her death, and had the effect of accelerating the remainders and making them become payable presently, instead of at the time designated in the will." The remaining beneficiaries were damaged "to the extent that their respective shares were diminished by the enlargement of the widow's share, and it benefited them by accel-

erating or pushing forward the time at which they would receive the full benefits of their remainder interest." Judge Digges went on to say (p. 29) that the rule (of no compensation) stated in the earlier cases was "firmly settled," but that in those cases "nothing was left in the estate which had been devised or bequeathed to the widow, after her renunciation and the receipt of her legal share, which could be sequestered for the purpose of reimbursing or making whole specific legacies or devises * * *."

It is true that the court did not go through the form of determining the then value of the renounced life estate. But it seems perfectly clear that the award of $3,500 to Mrs. White as compensation, out of an estate appraised at $135,000, was not in excess of the value of the life estate. I find nothing in the briefs of counsel or the opinion of the court to support a claim of a broader right than that of sequestration. The suggestion that the income should have been accumulated during the widow's life, and applied to the liquidation of the claim (as was apparently the relief granted in *Hinkley, supra*) is answered by the acceleration. The failure to value the life estate was probably due to the fact that the decree below was claimed to be a consent decree, wherein all parties agreed at least to the correctness of the result if sequestration were held to be in order. As stated by Professor Reno, *supra* (p. 302), "the amount sequestered was only a small portion of the actual present value of the renounced life estate." Upon that concessum in the case, it was unnecessary to obtain a precise valuation figure.

*Marriott v. Marriott, supra,* is also heavily relied on in the majority opinion. As I read the case, it was primarily concerned with the right of pecuniary legatees to be made whole out of the residue. The cases uniformly support this proposition, *Hanson v. Worthington,* 12 Md. 418; *Read v. Maryland General,* 157 Md. 565; *Mercantile Trust v. Schloss, supra.* It is true that the pecuniary legatees were also bequeathed the household furniture and personal effects of the testator, but this was a minor matter. The record in the case does not disclose the value of these items, and Judge Mitchell, for the Court, noted (p. 572) that the appeal of the Cushings was "directed to that part of the order which, by reason of the assertion by the widow of her

220

claim, apportions the consequent diminution of the testator's estate *among the pecuniary and the residuary legatees alike,* and thereby ignores priority to the *pecuniary* legatees." (Italics supplied.) In short, the only question presented on appeal in that case was the claim of pecuniary legatees to preference, and they did not claim any preference in regard to their specific bequests.

It is true that the opinion in *Marriott* seemed to equate pecuniary and specific bequests, and referred to cases in other states so holding. Yet the holding of the Court was "that the pecuniary legatees of Mr. Marriott are entitled to be first paid out of the net estate, after the widow's right has been ascertained and satisfied." I do not see how this limited and explicit holding can be expanded into a holding that specific legacies are entitled to a preference, contrary to a whole line of decided cases that *Marriott* did not purport to overrule. The majority opinion also misstates *Read, supra.* That case held that because a pecuniary legacy must be paid in full, the appellant (a pecuniary legatee) had no standing to appeal and contest other dispositions made by the decree. There was no specific legacy involved in the case.

I take it that the majority opinion does overrule prior cases, and substitutes for the established order, a glimpse of intention by a bare majority of this Court. But even on the point of intention I find no intention of the testator in the will before us to prefer former employees to his blood relations and those of his first wife, and the charities in which he had shown an unusual and abiding interest over a long period of years. The whole argument seems to rest on the fact that the specific legacies were mentioned first. Surely, this fact is not controlling. It is the usual practice in drafting a will to first list the specific legacies, if for no other reason, to insure that in case of lapse or ademption they fall into the residue. Moreover, the residuary clause commonly provides a trust for the primary object of concern, usually the widow and children. The opinion states that the employees were "first in his mind and * * * preferred * * * over all legatees * * * since all [the rest] of his estate * * * was to pass under the residuary clause * * *." This is to my mind a triumph of form over substance. The testator was obviously more concerned with perpetuating the business he had

founded than with the immediate enrichment of his associates. Only such loyal and devoted employees as should stick to the ship and survive him were to have any slice of the melon. They were all required to execute an irrevocable trust agreeing on behalf of themselves and their heirs and representatives not to sell without first offering their stock to the others at 40% of its book value, or, in other words, at a sacrifice of 60% of its current value. The plan seems designed to keep them all loyal and devoted, as in the testator's lifetime, until the last survivor should take all, thus holding out the inducement of a great prize. I find nothing in the plan to indicate an intention to presently benefit any employee, far less to indemnify him in cash for the loss of stock due to the widow's renunciation. It is perfectly clear from the testimony in the case that the testator knew that the antenuptial agreement could not be enforced, that the widow could renounce, and take in kind, and that the effect of a renunciation would be to decrease the amount of stock available. He deliberately chose to take the chance, and to provide no alternative. To my mind it is pure speculation to say that, in the event that happened, the residuary legatees must bear the loss. This is not equitable sequestration. It is robbing Peter to pay Paul.

Indeed, there is abundant reason to hold that the first tier legatees, at least, were to be preferred, as pecuniary legatees under *Marriott* to all others. Cf. *Church Extens'n M. E. Ch. v. Smith,* 56 Md. 362, 399. The actual residue of the estate was dealt with in what is called tier three. In *Webster v. Scott, supra,* this Court refused to compensate a specific legatee at the expense of pecuniary legatees, and distinguished *Schloss* on the express ground that that was a case of sequestration. The majority opinion makes the point that the intention of the testator that the loyal employees should receive a controlling interest can be carried out, because the widow has intimated that she is willing to sell her shares to them (presumably at $2,000 per share). Surely, that is an extraneous suggestion that should play no part in arriving at the testator's intention. Neither the widow nor the employees are bound to take advantage, or disadvantage, of the suggested offer. The truth is that the testator's plan was frustrated by the renunciation, and he made no provision

whatever as to where the loss should fall. It may be inferred that he intended the law to take its course. To require that the first and second tier legatees remunerate the employees in cash for the value of what the widow took as of right, is based on nothing but speculation and is in the teeth of the adjudicated Maryland cases. I cannot escape the conclusion that this Court is rewriting the testator's will, according to what the majority think he would have done, if compelled to do so. This is contrary to what this and other courts have repeatedly said they would not do. I would affirm the decision of the Chancellor.

Judge Sybert authorizes me to say that he concurs in the views here expressed.

Chief Judge Brune concurs on the point of intent.